STATE OF NORTH CAROLINA

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

FORSYTH COUNTY

CASE NO. 16CV52360

CAROLINA COUPON CLEARING, INC.
D/B/A CAROLINA SERVICES COMPANY, C.S.C.
INC.,

Plaintiff

v.

**COMPLAINT**

CARDINAL HEALTH MANAGED CARE
SERVICES, LLC, LEADER DRUG STORES,
INC., MEDICINE SHOPPE INTERNET,
INC., AND CARDINAL HEALTH, INC.,

Defendants.

---

Plaintiff Carolina Coupon Clearing, Inc. d/b/a Carolina Services Company, Inc., an Inmar

Inc. company (referred to herein as "Plaintiff" or "Inmar"), by and through its undersigned

counsel, complains of Defendants Cardinal Health Managed Care Services, LLC, Leader Drug

Stores, Inc., and Medicine Shoppe Internet, Inc., (referred to collectively herein as "The Cardinal

Group") and Cardinal Health, Inc. ("Cardinal Health") as follows:

### SUMMARY OF COMPLAINT

1.     Inmar brings this action to prevent Defendants from using Inmar's confidential

and proprietary information to launch a pharmacy payment reconciliation program that directly

competes with and is intended as a replacement for Inmar's own product in violation of multiple

agreements between Inmar and The Cardinal Group.

2.     As set forth below, Inmar has a contractual relationship with The Cardinal Group

and pharmacies ("Participating Stores") whereby Inmar provides services related to the payment

collection and reconciliation of pharmacy prescription payments.  Inmar alleges that The

1

Cardinal Group are in breach of this contract for failing to offer Participating Stores Inmar's Reconciliation Services, and for disclosing Inmar's confidential information to third party affiliates.

3. By developing a competing solution using Inmar's confidential information, and refusing to offer Inmar's products, Cardinal Health has acted in bad faith. All Defendants have improperly interfered with Inmar's relationship with the Participating Stores.

4. Inmar seeks declaratory and injunctive relief, together with money damages and attorneys' fees.

## PARTIES

5. Plaintiff Carolina Coupon Clearing, Inc. d/b/a Carolina Services Company, Inc. is a North Carolina corporation that operates as a subsidiary of Inmar, Inc., and has its principal place of business at 635 Vine Street, Winston Salem, North Carolina, 27101.

6. Upon information and belief, Cardinal Health, Inc. ("Cardinal Health") is an Ohio corporation having its principal place of business at 7000 Cardinal Place, Dublin, Ohio 43017.

7. Upon information and belief, Defendant Cardinal Health Managed Care Services, LLC is a Delaware corporation that operates as a subsidiary of Cardinal Health, and has its principal place of business at 7000 Cardinal Place, Dublin, Ohio 43017.

8. Upon information and belief, Leader Drug Stores, Inc. is a Delaware corporation that operates as a subsidiary of Cardinal Health and has its principal place of business at 7000 Cardinal Place, Dublin, Ohio 43017.

9. Upon information and belief, Medicine Shoppe Internet, Inc. is a Missouri corporation that operates as a subsidiary of Cardinal Health and has its principal place of business at 1 Rider Trail Plaza Drive, Suite 300, Earth City, MO 63045.

2

## VENUE AND JURISDICTION

10. Venue is proper in Forsyth County pursuant to N.C. Gen. Stat. §§ 1-79, 1-80, and 1-82, because Inmar resides and has its principal office in Forsyth County, and the causes of action pled arose in Forsyth County. Venue is also proper in Forsyth County because the parties agreed, under their contract, that any legal action or proceeding with respect to the Agreement at issue will be brought exclusively in the courts in the State of North Carolina.

11. This Court has jurisdiction over The Cardinal Group because those entities agreed, under their contract, to submit to the jurisdiction of the courts in North Carolina. Further, this Court has jurisdiction over The Cardinal Group and Cardinal Health pursuant to N.C. Gen. Stat. § 1-75.4 because, upon information and belief, The Cardinal Group and Cardinal Health both are engaged in substantial activity within this State.

12. This Court has jurisdiction over this matter pursuant to N.C. Gen. Stat. § 7A-243, because the amount in controversy exceeds $25,000.

## FACTUAL BACKGROUND

### About Defendants

13. On information and belief, Cardinal Health is a distributor of pharmaceuticals and other medical supplies and equipment in the United States.

14. On information and belief, The Cardinal Group consists of subsidiaries of Cardinal Health that work with pharmacies to provide contract assistance and prescription filling services, among other things.

15. On information and belief, in mid-2014, Cardinal Health established a company or affiliate called Fuse with a principle place of business at 4305 W Dublin Granville Rd, Dublin,

3

OH 43017. Fuse is a commercial technologies innovation lab that has been involved in the development of Cardinal Health's competing offering to provide pharmacy payment reconciliation services.

## About Inmar

16.     Inmar, Inc. is a technology company, founded in 1980, that operates intelligent commerce networks. Inmar, Inc. has developed a number of proprietary software platforms that connect online and offline transactions in real time.

17.     One of Inmar, Inc.'s proprietary software platforms provides services to the healthcare industry. Inmar, Inc. provides services to healthcare companies and pharmacies that allow for efficient tracking and reconciliation of patient prescription payments and the distribution of such payments.

18.     Carolina Services Company, Inc. is a subsidiary of Inmar, Inc. that provides a variety of services to Inmar, Inc.'s clients, including services related to Inmar's "Central Payment" services and "Reconciliation" services for pharmacies.

19.     In the United States, the filling of pharmaceutical prescriptions is a high volume industry. It is estimated that in 2016, 4.27 billion prescriptions will be filled in the United States.

20.     To obtain, distribute, and collect payment for drugs dispensed, pharmacies interact with a network of entities, including drug wholesalers and third-party payers. With limited time and resources, independent pharmacies often need assistance in interacting with these entities, particularly with third-party payers that include large private and public health plans. Most use a vendor to assist with such activities, known as a "Pharmacy Services Administrative Organization" (or "PSAO") to interact on their behalf.

21.     Inmar's "Central Payment" (or "Central Pay") service is a powerful financial management tool for independent pharmacy groups. Among other features, Central Pay receives

4

one consolidated payment for the entire PSAO, disaggregates the payment and makes Automated Clearing House (ACH) payments to individual stores within 24-48 hours.

22.     Inmar's Central Pay offering streamlines funds disaggregation for the pharmacy industry. By utilizing Inmar's Central Pay application, Inmar's clients reduce the possibility of misplaced checks or employee theft. Central Pay also eliminates the expense around paper check processing and provides auditable tracking for payments.

23.     In addition to Central Pay, Inmar's offerings also include a service that manages claims and reconciles payments for retail pharmacies to ensure appropriate reimbursement from healthcare payers. Such services are known as "Reconciliation Services" or simply "Reconciliation." Inmar is the largest provider of Reconciliation Services to pharmacies in the United States.

24.     When a consumer purchases a prescription at a pharmacy, and presents his or her insurance card, Inmar's financial Reconciliation Services ensure that the pharmacy is reimbursed the difference between the consumer co-pay and the contracted rate with the provider.

25.     Inmar's solutions automate highly complex, labor-intensive processes for reconciling the claims and managing the contracts among pharmacies, manufacturers and carriers.

### Inmar's Contractual Relationship with Cardinal

26.     On or around June 28, 2013, Inmar and The Cardinal Group (referred to in the Agreement as "Client") entered into a binding contract entitled "Central Payment and Reconciliation Agreement" (the "Agreement"). The Agreement includes a Nondisclosure Agreement ("NDA") that governs the exchange of confidential information between the parties and restricts disclosure of certain information, including information relating to the business

5

relationship between the parties. The Agreement was modified by an amendment dated June 19, 2015 (the "Amendment").

27. Pursuant to the Agreement, Inmar provides Reconciliation Services and Central Payment services to The Cardinal Group and to affiliated pharmacies ("Participating Stores.") At the time the parties entered into the Agreement, Inmar offered two versions of its Reconciliation offering, known respectively as "Reconciliation Basic" and "Reconciliation Complete."

28. The Agreement requires The Cardinal Group to offer Participating Stores Inmar Reconciliation Services.

29. Inmar's Reconciliation Services have been successful with stores affiliated with The Cardinal Group. The number of Participating Stores enrolled in Reconciliation Complete continues to increase year over year, and has increased approximately 40% since 2014.

**Inmar's Relationship with Participating Stores**

30. After a Participating Store enrolls in Central Pay, Inmar maintains a direct relationship with that Participating Store.

31. All of the Participating Stores are enrolled in Inmar's Central Pay program. A pharmacy may also enroll in one of Inmar's Reconciliation Services.

32. Exhibit A to the Agreement identifies the numerous services Inmar provides directly to Participating Stores.

33. Inmar also directly provides Participating Stores enrolled in Reconciliation programs with a number of additional services, including receiving and processing claims from all major switches (intermediary between pharmacy and insurance carrier); collecting unpaid claims; providing various reports summarizing collection recovery and write off detail; and for those stores enrolled in Reconciliation Complete, access to an online data portal, that is co-

6

branded with Cardinal Health, where Participating Stores may access payment and reconciliation data.

### Cardinal Intends to Cease Offering Inmar's Reconciliation Service and Substitute its Own Platform

34.    Cardinal Health did not disclose its development of a competing product until January of 2016.

35.    On or around January 13, 2016, representatives of Cardinal Health and The Cardinal Group informed Inmar of their intent to offer Participating Stores Cardinal Health's own competing reconciliation solution.

36.    By letter dated April 8, 2016, Cardinal Health and The Cardinal Group informed Inmar that Cardinal Health intends to place Participating Stores exclusively on the Cardinal Health reconciliation platform beginning on April 28, 2016. This is in spite of the Agreement's requirement that The Cardinal Group offer the Participating Stores enrollment in Inmar's Reconciliation Services.

37.    On or around April of 2016, Inmar representatives were informed by one or more Participating Store associates that the most recent contract offered to Participating Stores by The Cardinal Group no longer gives the Participating Stores the option of using any of Inmar's Reconciliation Services.

38.    Inmar has received calls from Participating Stores expressing concerns that Inmar's Reconciliation Services are not even being offered in The Cardinal Group's 2016 offerings.

39.    The Cardinal Group's failure to offer Inmar's Reconciliation Services to Participating Stores is a violation of the Agreement.

7

40.     The Cardinal Group's conduct threatens to irreparably harm Inmar by interfering with Inmar's relationship with Participating Stores.

### Cardinal Health's Platform Was Developed by Utilizing Inmar's Technology and Know-How

41.     Prior to working with Inmar, neither The Cardinal Group nor Cardinal Health had any reconciliation platform of its own, and they were not in the business of providing such services.

42.     Throughout the parties' relationship, Inmar has provided The Cardinal Group with access to Inmar's proprietary information under the shield of a Non-Disclosure Agreement ("NDA"), including confidential technical specifications, including Inmar's proprietary data specification, confidential data, including confidential data that has been normalized using Inmar's proprietary methodology, business know-how, pricing and customer information, and other proprietary information that, on information and belief, Cardinal Health has improperly used to develop is competing reconciliation solution.

43.     Inmar is informed and believes that developers of Cardinal Health's solution accessed Inmar's Data Portal, confidential data and specifications, and other proprietary information for purposes of developing Cardinal Health's competing solution, and did so at the request of or in connection with The Cardinal Group, in violation of the NDA.

44.     For example, Inmar is informed and believes that at least one Cardinal Health employee responsible for development, maintenance and support of health-care centered applications first accessed Inmar's Data Portal during the early stages of development of Cardinal Health's competing product and continued to frequently access the portal throughout the development process.

8

45.     Upon information and belief, other employees or agents of The Cardinal Group and/or Cardinal Health accessed Inmar's portal not for any legitimate business purpose, but to aid Cardinal Health in its development of a competitive reconciliation product.

46.     The Cardinal Group agreed to limit its use of Confidential Information solely in furtherance of the relationship between Inmar and The Cardinal Group and was prohibited from using Confidential Information solely for its own benefit.

47.     During the time that Cardinal Health was secretly developing its own competing product, The Cardinal Group representatives showed an increased interest in understanding Inmar's proprietary processes regarding collections from payers and electronic remittance advice. Inmar freely shared this information under the protections of the Agreement and Amendment thereto because Inmar understood that The Cardinal Group wanted to use this information to further support Participating Stores. But now it appears clear The Cardinal Group's interest was instead related to its development of the competing Cardinal Health product. On information and belief, The Cardinal Group has used Inmar Confidential Information, including at least Inmar's Central Payment platform details, proprietary reports, pricing details, proprietary data specification, usage statistics, performance statistics, and confidential technical benchmarking data, for its own benefit, including to develop its competing reconciliation platform (that is intended to work seamlessly with Inmar's Central Pay program) and competing business plans without prior written approval from Inmar.

48.     On information and belief, The Cardinal Group disclosed and transmitted data generated by Inmar in performance of the Services to unauthorized individuals at Cardinal Health and Fuse without the prior written consent of Inmar. On or around March of 2016, Inmar representatives visited Cardinal Health facilities and discussed the competing solution that

9

Cardinal Health is developing. At that time, Cardinal Health admitted it had accessed and used Inmar's Reconciliation Services to perform a side-by-side comparison and to benchmark its competing solution.

49. Further, according to calls received by Inmar from individuals at Participating Stores, Cardinal Health had and/or has been assuring Participating Stores that the forthcoming Cardinal Health competing reconciliation solution is an improved version of the Inmar Reconciliation Services offering.

50. On information and belief, Cardinal Health's reconciliation platform is derived from Inmar's platforms, and whether or not it is subjectively considered an improvement or enhancement, Inmar maintains the intellectual property rights, title and interest in the derivative work.

51. On information and belief, Cardinal Health and/or The Cardinal Group have disparaged Inmar's products. Inmar has received calls from Participating Stores describing such disparagement and explaining that Cardinal Health's and/or The Cardinal Group's representatives had informed Participating Stores that Inmar's Reconciliation Services were inadequate and inferior to Defendants' forthcoming product. Further, these calls from Participating Stores described Cardinal Health's and/or The Cardinal Group's representatives as saying that their forthcoming reconciliation program was an improvement over Inmar's Reconciliation Services and was intended to replace those services.

**Inmar's Attempts to Resolve This Dispute with Cardinal Have Been Unsuccessful**

52. When Inmar first became aware that Cardinal Health and/or The Cardinal Group were developing a competing reconciliation platform, it reached out to the Defendants to express concerns over their potential use of Inmar's proprietary information to create the platform in violation of the confidentiality obligations in the NDA and Agreement. Inmar also explained

10

that The Cardinal Group's decision to cease offering Inmar's Reconciliation Services was a breach of the Agreement and sought assurances that Inmar's products would continue to be offered to Participating Stores. The Cardinal Group has confirmed that it no longer intends to offer Inmar's Reconciliation Services to Participating Stores.

53.     Despite several letters back and forth, and an in person meeting, the parties were unable to reach a resolution.

### FIRST CLAIM FOR RELIEF: BREACH OF CONTRACT

54.     Inmar incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

55.     The Cardinal Group entered into an Agreement with Inmar. The Agreement was entered into for good and valuable consideration.

56.     Exhibit B to the Agreement entered into between The Cardinal Group and Inmar is a Non-Disclosure Agreement (NDA) that restricts the use of and disclosure of Confidential Information shared between the parties.

57.     The Agreement further places restrictions on the ability to share proprietary and confidential information with any third parties.

58.     Inmar fully performed and completed all material obligations required of it under the Agreement as modified by the Amendment, including the NDA.

59.     Inmar learned that The Cardinal Group had violated the provisions of the Agreement, including Section 12.2, and of the Non-Disclosure Agreement, including Section 2.1.

60.     Alternatively, to the extent Cardinal Health and/or Fuse employees to whom disclosure of such Confidential Information was made can reasonably be considered

11

representatives of The Cardinal Group, The Cardinal Group breached the NDA, including Section 2.2.

61.     To the extent Cardinal Health and/or Fuse employees to whom disclosure of such Confidential Information was made are considered representatives who needed to know such Confidential Information for purpose of the Relationship between Inmar and The Cardinal Group, the employees' use of such information for purposes of developing the competing reconciliation solution is a direct violation of at least Section 2.1 of the NDA. The Cardinal Group is responsible for such a breach.

62.     The Cardinal Group further breached the Agreement and NDA by using Inmar's Confidential Information for its own benefit.

63.     On information and belief, The Cardinal Group have breached the Agreement by no longer offering Inmar's Reconciliation Services.

64.     The Cardinal Group's failure to offer Inmar's Reconciliation Services to Participating Stores constitutes a material breach of contract.

65.     As a direct and proximate result of The Cardinal Group's breach of contract, Inmar has been damaged in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF: ANTICIPATORY BREACH OF CONTRACT**

66.     Inmar incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

67.     The Cardinal Group entered into an Agreement with Inmar pursuant to which they promised they would provide Participating Stores with a choice amongst Inmar's Reconciliation Services. The Agreement was entered into for good and valuable consideration.

68.     Inmar fully performed and completed all material obligations required of it under the Agreement as modified by the Amendment.

12

69.     Inmar learned that, to the extent they have not already, The Cardinal Group are likely to violate the promise to provide Participating Stores with a choice amongst Inmar's Reconciliation Services, and they will be placing all Participating Stores on Cardinal Health's competing solution beginning April 28, 2016. Inmar requested assurances that The Cardinal Group would not violate its promises under both the Agreement and Amendment and that The Cardinal Group would continue to also offer Participating Stores the Inmar Reconciliation Services. The Cardinal Group has confirmed that it will no longer offer Inmar's Reconciliation Services.

70.     The Cardinal Group's affirmative refusal to fully perform their duties under the Agreement and Amendment constitutes an anticipatory breach of contract.

71.     As a direct and proximate result of The Cardinal Group's anticipatory breach of contract, Inmar has been damaged in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

72.     Inmar incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

73.     Inmar and The Cardinal Group entered into an Agreement and Amendment for valuable consideration. Every contract imposes the duty of good faith and fair dealing upon the parties in performance and enforcement of the contract.

74.     The Cardinal Group has acted in bad faith by not giving equal consideration to the interests of Inmar as they have their own interests. The Cardinal Group have wrongfully and intentionally breached the duty of good faith and fair dealing by breaching both the Agreement and Amendment by not providing Participating Stores with a choice amongst Inmar's Reconciliation Services whilst substituting in its own reconciliation program, which was

13

developed in secret using proprietary materials requested from and provided by Inmar under false pretenses.

75. The Cardinal Group further violated its duty of good faith and fair dealing by disparaging Inmar's Reconciliation Services, and by utilizing Inmar confidential information to assist in the development of their parent company's competing reconciliation platform.

76. As a direct and proximate result of The Cardinal Group's breach of the covenant of good faith and fair dealing, Inmar has been damaged in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

77. Inmar incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

78. Under the terms of the Agreement and Amendment, Inmar reasonably expected to be linked with new Participating Stores and to continue to work with Participating Stores that had already signed up for one of Inmar's Reconciliation Services and to be paid for these services.

79. The Cardinal Group have disparaged Inmar's Reconciliation Services, and since the beginning of 2016 have refused to provide the Participating Stores with a choice amongst Inmar's Reconciliation Services; instead The Cardinal Group has substituted, or intends to substitute, Cardinal Health's own reconciliation program for the Participating Store to use.

80. Cardinal Health developed its own reconciliation program for the purpose of replacing Inmar's Reconciliation Services that were being provided to Participating Stores.

81. At all times The Cardinal Group and Cardinal Health knew of the ongoing relationships between Inmar and the Participating Stores and the imminence of future relationships between Inmar and new Participating Stores.

14

82.     Without The Cardinal Group's and/or Cardinal Health's interference, Participating Stores would have continued to use one of Inmar's Reconciliation Services and future Participating Stores would have chosen amongst Inmar's Reconciliation Services.

83.     The Cardinal Group and/or Cardinal Health acted without justification for interfering with the prospective economic relationship between Inmar and Participating Stores.

84.     As a direct and proximate result of Defendants' tortious interference, Inmar has been damaged in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF: TORTIOUS INTERFERENCE WITH CONTRACT

85.     Inmar incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

86.     As pleaded above, Inmar and The Cardinal Group entered into a valid Agreement and Amendment.

87.     When a Participating Store enrolls in Inmar's Central Pay, individual pharmacies establish a direct relationship with Inmar and authorizes Inmar to initiate payments to the pharmacy's accounts.   After this relationship between Inmar and an individual pharmacy is formed, that relationship is further expanded when an individual pharmacy chooses an Inmar Reconciliation Service.

88.     Without Cardinal Health's and/or The Cardinal Group's interference and development of a competing reconciliation platform, which utilized the Confidential Information and trade secrets belonging to Inmar, Inmar would continue to supply Reconciliation Services to Participating Stores.

89.     Cardinal Health and/or The Cardinal Group acted without justification for interfering in the contractual relationship between Inmar and Participating Stores.

15

90.    As a direct and proximate result of Cardinal Health's and/or The Cardinal Group's tortious interference, Inmar has been damaged in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF: VIOLATION OF THE UNFAIR AND DECEPTIVE TRADE PRACTICES ACT; N.C. GEN. STAT. § 75-1.1, *ET SEQ.*

91.    Inmar incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

92.    While purporting to work cooperatively with Inmar to serve Participating Stores, Cardinal Health, in secret and outside of Inmar's knowledge, created its own reconciliation program based, on information and belief, at least in part, on Inmar's own proprietary information and reconciliation programs.

93.    On information and belief, Cardinal Health used Inmar's confidential information, by and through The Cardinal Group, to create its own reconciliation program. This included accessing Inmar's reconciliation portal for the purposes of developing, testing, and benchmarking the Cardinal Health product.

94.    Additionally, The Cardinal Group and/or Cardinal Health have been disparaging Inmar's products and services and telling Participating Stores that Inmar's products and services are inferior to Cardinal Health's own forthcoming product, which will soon be a replacement for Inmar's products and services.

95.    Cardinal Health and The Cardinal Group's actions were in or affecting commerce.

96.    As a direct and proximate result of Cardinal Health and The Cardinal Group's unfair and deceptive business practices, Inmar was injured in an amount to be proven at trial. Inmar is also entitled to have all damages trebled and to an award of attorney's fees pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1.

## SEVENTH CLAIM FOR RELIEF: VIOLATION OF THE TRADE SECRETS PROTECTION ACT; N.C. GEN. STAT. § 66-152, *ET SEQ.*

97.     Inmar incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

98.     At all relevant times, Inmar was in possession of business or technical information and trade secret information as defined by N.C. Gen. Stat. § 66-152(3). These trade secrets and confidential information include, but are not limited to, all confidential information related to Inmar's Reconciliation Services including Inmar's pricing, non-public details regarding Inmar's customer relationships, statistics regarding usage patterns and volume, details regarding Inmar's customer support histories, confidential data files, confidential data specifications, Inmar's product roadmaps, and all internal operational reports and data generated by Inmar.

99.     The proprietary business or technical information of Inmar constitutes trade secrets because Inmar derives independent economic value from that information, such information is not generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain is secrecy. Inmar's confidential and proprietary trade secret information described herein is not and was not generally known to Inmar's competitors in the industry.

100.    Inmar is informed and believes and therefore alleges that Defendants have actually misappropriated and/or threatened to misappropriate Inmar's trade secrets without Inmar's consent in violation of the Trade Secrets Protection Act found in Section 66-152 of the North Carolina General Statutes. Defendants cannot implement their own reconciliation programs without utilizing and disclosing Inmar's trade secrets and confidential information.

101. Defendants have created their own competing reconciliation program by utilizing Inmar's trade secrets and confidential information. This is not only a violation of the Trade Secrets Protection Act found in Section 66-152 of the North Carolina General Statutes but the Non-Disclosure Agreement that is incorporated into the Agreement.

102. Defendants' employees, including programmers, had access to Inmar's reconciliation program and confidential Data Portal, and were further provided confidential information under the terms of the NDA. Defendants used the access to misappropriate Inmar's trade secrets without Inmar's consent. Defendants also admitted that they use Inmar's reconciliation program in a side-by-side comparison to benchmark its own reconciliation program during testing.

103. As a result of Defendants' misappropriation of Inmar's trade secrets, Cardinal Health and/or The Cardinal Group are now able to offer a competing reconciliation program to Participating Stores where they could not have offered such a competing product without such misappropriation.

104. As a proximate result of Defendants' misappropriation of Inmar's trade secrets and confidential information, Inmar has suffered, and will continue to suffer, damage in an amount to be proven at trial.

105. As a further proximate result of Defendants' wrongful conduct and misappropriation, Inmar has been injured, irreparably and otherwise, and is threatened with additional and on-going injuries. Because Inmar's remedies at law are inadequate, Inmar seeks permanent injunctive relief under N.C. Gen. Stat. § 66-154(a)(1). Inmar is threatened with losing customers, technology, its competitive advantage, its trade secrets and goodwill in amounts

18

which may be impossible to determine, unless all Defendants are enjoined and restrained by order of this Court, as alleged above.

106. Defendants have been unjustly enriched and Inmar is entitled to all recoverable damages in the amount of actual damages to be proven at the time of trial or the unjust enrichment caused by misappropriation of a trade secret, whichever is greater under N.C. Gen. Stat. § 66-154(b).

107. Defendants' misappropriation has been willful, malicious and in bad faith in light of Defendants' violation of the Non-Disclosure Agreement entered into between the parties and Inmar's repeated admonition against the use of its trade secrets. Therefore, Inmar is entitled to punitive damages and/or reasonable attorneys' fees under N.C. Gen. Stat. § 66-154(c) and (d).

## EIGHTH CLAIM FOR RELIEF: DECLARATORY JUDGMENT

108. Inmar incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

109. On information and belief, Defendants' competing reconciliation program, as alleged above, is the fruit of the misappropriation of Inmar's trade secrets and confidential information. Because Defendants' reconciliation program was developed based on the methodology, technology, and know-how that Inmar uses to provide Reconciliation Services, it is the exclusive property of Inmar.

110. On information and belief, Defendants' competing reconciliation program purports to be an enhancement and/or improvement to Inmar's Reconciliation Services.

111. As a direct and proximate result of Defendants' misappropriation of Inmar's trade secrets and Confidential Information and pursuant to the Agreement, Inmar asks this Court for an Order declaring that Defendants' reconciliation program is the exclusive property of Inmar.

19

**WHEREFORE, PLAINTIFFS RESPECTFULLY PRAY THE COURT** grant the following relief:

a.   For injunctive relief prohibiting defendants and their agents, employees, successors, representatives and assigns, and all other parties acting in concert with them with knowledge of said Order, from implementing, distributing, or using Defendants' reconciliation program, pursuant to N.C. Gen. Stat. § 75-14, N.C. Gen. Stat. § 66-154, and the Court's inherent equitable power;

b.   That Defendants be required to pay damages for their anticipated breach of contract and breach of contract in an amount to be determined at trial;

c.   That all damages be trebled pursuant to N.C. Gen. Stat. § 75-16;

d.   That the costs of this action, including a reasonable attorney's fee, be taxed against Defendants;

e.   That Defendants be ordered to pay punitive damages to Inmar, pursuant to N.C. Gen. Stat. § 66-154;

f.   For pre and post judgment interest as allowed by law;

g.   For trial by jury on all issues so triable; and

h.   That Inmar receive such other and further relief as to the Court seems just and appropriate.

This the 26th day of April, 2016

Ronald R. Davis
N.C. State Bar No. 20408
James A. Dean
N.C. State Bar No. 39623
Womble Carlyle Sandridge & Rice, LLP
One West Fourth Street
Winston Salem, NC 27101
Telephone: (336) 721-3600
Facsimile: (336) 721-3660
rdavis@wcsr.com
jdean@wcsr.com